**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    - v -

    2:11-cr-0062 (PAC)

MICHAEL OIRING,

       Defendant.

## SENTENCING MEMORANDUM ON BEHALF OF MICHAEL OIRING

MORVILLO LLP
500 Fifth Avenue, 43rd Floor
New York, New York 10110
Telephone:    (212) 796-6330
Facsimile:    (212) 240-8267

*Attorneys for Defendant Michael Oiring*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND AND RELEVANT FACTS ....................................................... 2

I.      PERSONAL HISTORY ............................................................................ 2

  A.    Mr. Oiring's Childhood, Education, and Professional Experience ........................... 2

  B.    Mr. Oiring's Relationship With His Family ................................ 6

  C.    Mr. Oiring's Volunteer Service ................................................... 8

II.     THE OFFENSE CONDUCT ................................................................. 9

SENTENCING ANALYSIS .............................................................................. 10

III.    THE SENTENCING FACTORS ENUMERATED IN 18 U.S.C. §3553(a) ........... 10

  A.    Downward Departures under the Guidelines: ........................................... 11

      1.    Mr. Oiring Has Provided Substantial Assistance to the Government ....... 12

      2.    Mr. Oiring's Cooperation Helped Facilitate the Proper Administration of Justice ................................................................................. 15

      3.    Mr. Oiring's Post Offense Rehabilitation ................................. 17

  B.    Additional Factors Under Section 3553(a) ............................................. 19

      1.    Mr. Oiring's History and Characteristics ................................... 20

        a.    Any Term of Incarceration Would Cause a Hardship to the Oiring Family ................................................................. 23

      2.    The Need to Provide Adequate Deterrence and Protect the Public from Future Crimes of the Defendant ................................................ 24

  C.    The Need to Avoid Unwarranted Sentencing Disparities .................................. 25

      1.    Mr. Oiring is Comparable to Messrs. Halbirt, Steinberg, and Hurwitt ..... 26

      2.    Mr. Oiring Is Not Comparable to the Defendants Who Received Custodial Sentences ........................................................................... 28

CONCLUSION ................................................................................................... 29

## **TABLE OF AUTHORITIES**

### Cases

Gall v. United States, 552 U.S. 38 (2007) ............................................................ 19, 20

Kimbrough v. United States, 552 U.S. 85 (2007) ...................................................... 11

Koon v. United States, 518 U.S. 81 (1996) ................................................................ 11

Pepper v. United States, 562 U.S. 477 (2011) ........................................................... 11

Simon v. United States, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) ............................... 11, 25

United States v. Barton, 76 F.3d 499 (2d Cir. 1996) .................................................. 17

United States v. Blake, 89 F. Supp. 2d 328 (E.D.N.Y. 2000).................................. 18, 19

United States v. Bland, et al 11 Cr. 62-03 (PAC) ...................................................... 28

United States v. Bobb, 1993 WL 8653 (S.D.N.Y. 2003).............................................. 15

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008)............................................ 10, 11

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005)............................................ 11, 19

United States v. Crouse, 145 F.3d 786 (6th Cir. 1998)............................................... 22

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) ............................................ 21

United States v. Garcia, 926 F.2d 125 (2d Cir. 1991) ........................................... 15, 17

United States v. Halbirt, 11 Cr. 62-03 (PAC) ........................................................... 26

United States v. Hurwitt, 11 Cr. 62-05 (PAC)........................................................... 26

United States v. Jones, 531 F.3d 163 (2d Cir. 2008) ............................................. 11, 20

United States v. Levy, 11 Cr. 62-11 (PAC) ............................................................... 28

United States v. Mackey, 11 Cr. 62-07 (PAC) ........................................................... 28

United States v. Mehta, No. Crim.01-10180-NG, 2004 WL 418119 (D.Mass. March 3, 2004).. 22

United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008).................................... 20

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) .............................................. 22

United States v. Shuster, 331 F.3d 294 (2d Cir. 2003) ............................................... 22

United States v. Speed Joyeros, S.A., 204 F.Supp.2d 412 (E.D.N.Y. 2002).................. 12

United States v. Steinberg, 11 Cr. 62-02 (PAC) ........................................................ 26

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009)............................................ 10, 12

United States v. Williams, 65 F.3d 301 (2d Cir. 1995) ............................................... 18

United States v. Wong, 40 F.3d 1347 (2d Cir. 1994) .................................................. 17

<u>S<span>TATUTES</span></u>

15 U.S.C. §78ff ......................................................................................................................... 9

15 U.S.C. §78j(b) ..................................................................................................................... 9

18 U.S.C. §1343 ....................................................................................................................... 9

18 U.S.C. §3553(a) ........................................................................................................... 10, 19

18 U.S.C. §3553(a)(6) ............................................................................................................ 25

His friends need him. The elderly and sick need him. We need his words of comfort. We need his smile. His family members need him. … They also need his day to day assistance. … This sentence effects [*sic*] the lives of many. It effects [*sic*] family, friends and the sick and elderly. For the sake of us all, Honorable Judge Crotty, please be as lenient as possible.

Letter of Rabbi Mordechai Sussman, attached hereto as Exhibit A at 4.

## PRELIMINARY STATEMENT

Michael Oiring respectfully submits this memorandum for the Court's consideration in advance of his sentencing.

Mr. Oiring made a serious error in judgment when he agreed to engage in the conduct that brings him before this Court.  And yet, in the wake of that error in judgment, Michael has done exactly what society hopes for from people in his position, he cooperated with the government in an effort to demonstrate acceptance of responsibility; indeed, he has gone well-beyond that in seeking to rehabilitate himself.  Michael began to cooperate in the immediate aftermath of his arrest and it lasted for approximately five years.  It saw him work to assist the United States Attorney's Office for the Southern District of New York ("USAO"), the Securities and Exchange Commission ("SEC") and the New York District Attorney's Office ("DA's Office").  Michael provided timely information about a wide-spread market manipulation scheme the USAO had been investigating.  He participated in proactive cooperation by making recorded phone calls and contacting potential targets via the internet.  He also revealed information about certain conduct and transactions about which the USAO was previously unaware.  He agreed to do the same for the DA's Office, as well.  All-in-all, his cooperation has been substantial, lengthy and productive for the government.  In and of itself, his cooperation warrants leniency.

However, simply making amends by assisting the government did not satisfy Michael's need to demonstrate that he had learned from his errors.  Michael volunteered his time to a local community center that provided companionship for the elderly or incapacitated.  Michael flourished in this role.  He spent hours upon hours each week for the past several years tending to the needs of those in his community.  This work changed him, probably more than he thought it would, and caused him to alter his life's direction.  While once Michael saw himself working only in a business connected to the stock market, he shifted his goals and joined his brother in running a community center for the elderly in Queens.

Without question Michael Oiring made a serious error in judgment.  But this is not the sum total of his life.  His cooperation and community service demonstrate that Michael is a changed person, one who puts others' needs before his own.  He has shown this through his cooperation and volunteer work.  He has shown it through dedication to his family and his community.  In short, Michael Oiring has used the past five years to significantly and permanently change his life and his future.  Thus, he and his family and friends, respectfully request that this Court consider all of this, and more, and grant Mr. Oiring a probationary sentence.

## BACKGROUND AND RELEVANT FACTS

I.   **PERSONAL HISTORY**

### A.  Mr. Oiring's Childhood, Education, and Professional Experience

Michael Oiring, born on February 26, 1981, is Eli and Pnina Oiring's third child. Michael has two older siblings, Morris and Charlyne.  The Oiring family has always been and continues to be very close and supportive of one another.

Michael grew up in Borough Park, Brooklyn in an Orthodox Jewish household.  For most of Michael's life, the Oirings were a one income family.  Eli taught social studies, reading, and health in the Bronx and Brooklyn.  See Letter of Eli Oiring, attached hereto as Exhibit A at 5. Before giving birth to Michael, Pnina taught English as a foreign language at a high school; but she gave up teaching to become a full time, stay at home mother.  See Letter of Pnina Oiring, attached hereto as Exhibit A at 7.  While the decision significantly impacted the families' finances, the Oirings believed Pnina's full time presence at home to raise the children was more valuable to the family than the lost income.

Michael attended Chaim Berlin High School in Borough Park.  He enjoyed school and his attitude and grades reflected it.  This made Michael popular with his peers.  See Letter of Yehoshua Rapps, attached hereto as Exhibit A at 9. (Michael "…was funny and always quick with a joke, but also sensitive and a genuinely nice person.").  His easy going, pleasant manner captured the teachers' attention as well, where he "was always the teacher's favorite."  Id.

Michael always intended to go to college after high school.  However, when the time came, he became unconvinced that college served him best.  Michael longed for real world experience as opposed to more academic pursuits.  Nevertheless, he made the safer choice and chose further education.  He attended Empire State College in Saratoga Springs, New York.  In conjunction with his class load, Michael worked part-time tutoring high school students in Torah study.

Michael embraced tutoring because it married his desire for practical application of his skills with academic pursuit.  Yet, as he concentrated on helping struggling students, Michael became increasingly less interested in college life.  While he continued to earn good grades, Michael enjoyed tutoring far more than his classroom pursuits.

3

Michael mentored his "students," and the assistance he provided them extended beyond academics.  During one tutoring session, a young man asked Michael for help with a personal issue.  The young man's parents were in the midst of a bitter divorce.  A social worker recommended the young man live with his father, despite the boy's desire to remain with his mother.  After unburdening himself to Michael, the young man asked if Michael would speak with the social worker about her recommendation.  Michael, of course, obliged and prevailed in convincing the social worker to change her recommendation in the divorce proceedings.  Thereafter, Michael became a kind of special confidant for his student and spent countless hours lending a sympathetic ear to him.  Michael's willingness to spend time with the young man allowed him to both vent his frustrations and to avoid his uncomfortable home life.  As is discussed below, Michael's desire to help others continues to play a significant role in his life.

Ultimately, college life, even with tutoring, did not satisfy Michael's desire for real world experience.  As a result, Michael withdrew from college and pursued a career.  He had always been interested in the stock market and thus, set out to work in that industry.  Even with no experience, Michael secured a position at Quinn Consulting ("Quinn"), an online marketing group.  Michael worked as a stock promoter, someone who researched and touted certain stocks.  As a junior associate at Quinn, Michael's job required him to solicit investors for small companies.  This excited Michael because he ultimately got paid to learn about the stock market and online marketing.  He worked with Quinn for approximately five years, until his arrest in October 2010.

In the years after Michael's arrest, he struggled to find gainful employment.  With no paycheck, Michael decided that if he could not find paid work he would give his services away.  Thus, as is discussed in more detail below, Michael's first post-arrest "job" was a volunteer

4

position at Bikur Cholim.  Hebrew for "visiting the sick," Bikur Cholim is a "grass-roots community charitable organization established by Holocaust survivors whose mission was to assist the sick and needy with financial assistance, emotional help and supportive services."  <u>See</u> http://bicco.org/.  Michael's work at Bikur Cholim consisted of spending time with lonely or needy senior citizens by making home visits, or visiting seniors at the nursing home.  He has volunteered at Bikur Cholim for approximately four years.

Although Michael embraced his volunteer work, he knew that he needed a new career.  Thus, while volunteering for Bikur Cholim, Michael attempted to start his own business.  In 2012, Michael attended a one-week training program with Commercial Capital Training Group in Albany, New York, which focused on how to run a capital financing business.  Using what he learned from his course, Michael opened a business centered on connecting money lenders and small businesses.  His timing was less than ideal because he entered the business during the recession.  As a result, in short order, his business failed.

However, his entrepreneurial spirit and volunteer work moved his brother, Morris, who recognized Michael's passion for helping others, and asked him to work at a fledgling business, Genesis Adult Daycare Center ("Genesis").  Genesis is a facility that organizes day-time recreational activities geared towards the elderly and disabled.

In 2014, Michael began to work for Genesis.  He helps manage the facility and works with the seniors.  <u>See</u> Letter of Morris Oiring, attached hereto as Exhibit A at 11.  Michael's mother often volunteers at Genesis; she sees firsthand how much Michael enjoys his work and how much the seniors enjoy his "willingness to help."  Pnina Letter, Ex. A at 7.  The seniors "know they can come to [Michael] with any request, special or otherwise."  <u>Id</u>.

The best part of Michael's job is the time he spends with the seniors.  "Michael always asks the seniors for their input, and strives to plan activities they will enjoy."  Eli Letter, Ex. A at 6.  Indeed, he often takes the group on day trips to a movie theater, or a favorite restaurant.  See id.  He organizes raffles and games where the winners receive prizes; the prizes are always a big hit with the winners.  Because Michael cares about each senior in his care, and wants no one to feel left out, he secretly makes sure that everyone comes out a winner.  See id.  ("If one of the seniors feels hurt that he or she hasn't won a prize in a while, Michael will take them aside and give them a prize so they do not feel left out.").

Although Michael always wanted to work in the stock market, his friends and family believe that his volunteer service at Bikur Cholim and his job at Genesis have been the most rewarding of his life.  He truly enjoys working with the seniors and does all he can to provide them with an entertaining and stress-free environment.  See id.

### B.  Mr. Oiring's Relationship With His Family

The Oiring family is close both in spirit and proximity.  Michael and Morris currently live at home with their elderly parents.  After Charlyne married she found a home for her own family, but did not go far; the middle Oiring child lives only a short car ride away.  The entire Oiring family gets together on a weekly basis.

Michael and his parents share a special bond.  Eli and Pnina rely on Michael for both emotional and financial support, and his parents appreciate that he prioritizes their needs.  As Pnina and Eli grow older, it becomes increasingly difficult for them to keep up with the amount of work that is required to maintain their home.  See Pnina Letter, Ex. A at 7. ("Michael is always there to help us when we need him."); see also Eli Letter, Ex. A at 5. ("Michael is always there for our family when we need him…his help around the house is invaluable.").

Michael helps outside the house as well.  Pnina does not have a driver's license, and Eli is unable to drive due to his ███████████████████.  Michael fills this void by driving his parents wherever they need to go.  He routinely takes his mother to the grocery store and his father to doctors' appointments, and more.  Indeed, Michael takes his parents wherever they need to go.

A good example of Michael's dedication to his parents is when Eli recently underwent ████████████████.  Eli had been in increasing pain for quite some time.  He dealt with it as long as he could, until surgery became a necessity.  Just before Eli had surgery the pain became so severe that even the slightest movement caused him excruciating pain.  Michael took it upon himself to tend to his father's every need so that Eli could move as little as possible. After the surgery, Michael continued to cater to his father's needs.  Michael made sure that Eli completed his daily exercise regimen.  He made sure Eli followed the doctors' instructions.  He took his father to his doctor's appointments, to temple, and more.  In short, Michael became something of a personal assistant to his father.  His efforts did not go unnoticed; "Whether it was visiting and providing moral support while his father was in a rehabilitation center or assisting his father in attending the local synagogue…Michael was always there to help."  Letter of Moshe Stareshefsky, attached hereto as Exhibit A at 13.

Despite his hectic work and home schedules, Michael tries to make time to help his sister each week, as well.  When Michael has free time, he can usually be found at his sister's house visiting his nieces and nephew, 14-year-old ███████, 11-year-old ██████, and 6-year-old ██████. Michael babysits for Charlyne every chance he can, and often takes the children to the park or to the movies, and helps them with their homework.  See Letter of Charlyne Travis, attached hereto

as Exhibit A at 15.  "Michael's nieces and nephews light up when they see him."  Letter of

Moshe Don Lederfeind, attached hereto as Exhibit A at 17.

### C.  Mr. Oiring's Volunteer Service

In the aftermath of his arrest, Michael struggled to find paid employment.  As a result, he

decided to volunteer his time to a worthwhile cause.  As mentioned above, Michael volunteered

at Bikur Cholim in Borough Park, a community outreach program that assists the sick and

elderly.  Michael does not have special training, he simply does what has always come naturally

-- he listens to and comforts the seniors.  Indeed, Michael has spent hours listening to Bikur

Cholim's clients as they share stories about life, family, and the future.  Rabbi Sussman is

familiar with Michael's work at Bikur Cholim, and describes his impact on the seniors as

follows:

> Michael is someone who visits and cares for the elderly and the sick.
> I know of some of the very sick people that he would try to comfort
> and lift up their spirits. He would act as a listening ear and try to do
> whatever he could to alleviate some of their pain. He made them feel
> that there is someone who truly cares about them. He also helped
> elderly people with their shopping. He would shop for them and
> deliver their groceries. He is surely a blessing to society.

Sussman Letter, Ex. A at 3.

Bikur Cholim volunteers are generally sent to visit with one specific individual.  Michael

excelled at this, and so on the recommendation of Bikur Cholim administrators, he took on the

responsibility of visiting residents at Haym Salomon, a local nursing home.  Michael is equally

adept at either assignment.  He often plays games with the seniors during their time together, and

makes sure they are mentally engaged and not lonely.

These experiences have benefited the seniors with whom Michael interacted, but also

unexpectedly impacted him.  After a typical day of volunteer work, Michael discusses his

experiences with his family.  Eli recalls how Michael shared stories about one specific senior named Oscar, a resident of the Haym Salomon nursing home.  One day while Michael visited the nursing home he met Oscar.  Oscar and Michael hit it off immediately.  They had the same sense of humor and numerous common interests.  Thereafter, Michael visited Oscar virtually every week for over two years.  When Oscar could not feed himself, Michael spoon fed his friend. When Oscar's son became ill, Michael spent extra hours visiting Oscar to take his mind off his son's illness and provided additional companionship and comfort.  See Eli Letter, Ex. A at 6. The two shared a special relationship.  When Michael learned Oscar had passed away he was left in tears.

Pnina likewise recalls a special person to Michael.  Unlike Oscar, this person was a middle-aged man who had recently lost his wife and saw no reason to continue living.  See Pnina Letter, Ex. A at 8.  The man had no one to talk to during the day because his children worked; Michael became one of the few individuals with whom this man interacted.  The man came to depend on Michael and confided in him the depth of his pain and how much he missed his wife. Michael sat with and spoke with this suffering gentleman for hours every day just to help take his mind off of his problems.  "Michael treated him as one of his own family members."  Id.

## II.    THE OFFENSE CONDUCT

On June 28, 2011, Michael Oiring entered a guilty plea pursuant to a cooperation agreement.  The six-count Information charged him with one count of conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. §1343 and 15 U.S.C. §§78j(b), 78ff, and five substantive counts of securities fraud in violation of 15 U.S.C. §§78j(b),  78ff.  The charges relate to Mr. Oiring's involvement in certain stock manipulations between 2008 and 2010. While Mr. Oiring played only a limited role in comparison to other co-conspirators, he

acknowledged the severity of his improper conduct and accepted full responsibility for his wrongdoing.

Mr. Oiring participated in the manipulations in three ways. First, Mr. Oiring posted positive reviews online to create the appearance of market interest in a certain security. Along with others, Mr. Oiring created multiple online screennames and posted positive comments on websites and message boards, and in chat rooms. Next, Mr. Oiring and others purchased shares of the target company in their personal trading accounts. This coordinated effort sought to artificially inflate the value of the securities in question. If the price increased as planned, Mr. Oiring and other insiders sold their shares pursuant to an agreed upon schedule. The coordinated selling caused the price to decrease, sometimes dramatically. Finally, Mr. Oiring solicited other stock promoters to participate in the various phases of the manipulation.

Mr. Oiring knew his conduct was wrong at the time he engaged in it. He deeply regrets his actions, pleaded guilty as a result of his conduct, and provided substantial assistance to the government in its investigations of others.

## **SENTENCING ANALYSIS**

## **III.    THE SENTENCING FACTORS ENUMERATED IN 18 U.S.C. §3553(a)**

It is axiomatic that Section 3553(a) of Title 18 of the United States Code controls sentencing in criminal cases. It provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §3553(a); see also United States v. Stewart, 590 F.3d 93, n.17 (2d Cir. 2009). As the Court well knows, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

The Court must calculate the United States Federal Sentencing Guidelines (the "Guidelines") before imposing sentence, but is not obligated to impose a sentence consistent therewith.  "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." Id. at 189.  The Guidelines merely come into play as one among many factors contemplated under §3553(a).  In considering the §3553(a) factors, the Court should give no greater weight to the Guidelines calculation than any of the other factors.  See Kimbrough v. United States, 552 U.S. 85, 101 (2007); see also Simon v. United States, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005).  Indeed, the Court "must make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).  Thus, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that the punishment must fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 477 (2011) (internal citations omitted).  After considering all of the §3553(a) factors, the Court should decide whether to "impose . . . a sentence within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

## A.  Downward Departures under the Guidelines:

In the instant case, there are three main grounds on which this Court is empowered to grant Mr. Oiring a downward departure under the Guidelines.  They are:  1) his cooperation over a five-year period that resulted in substantial assistance to the USAO, the SEC, and the DA's

Office; 2) his help facilitating the proper administration of justice by pleading guilty early and

cooperating against others who later pleaded guilty; and 3) his post offense rehabilitation.

       1.        <u>Mr. Oiring Has Provided Substantial Assistance to the Government</u>

Mr. Oiring's cooperation with multiple government agencies warrants a downward

departure.  As the Court well knows, §5k1.1 provides that "[u]pon motion of the government

stating that the defendant has provided substantial assistance in the investigation or prosecution

of another person who has committed an offense, the court may depart from the guidelines."

When the government makes a §5k1.1 motion based on the defendant's cooperation, there is no

limit to the court's authority to depart downward from the Guidelines range.  <u>See</u> <u>United States</u>

<u>v. Speed Joyeros, S.A.</u>, 204 F.Supp.2d 412, 427 (E.D.N.Y. 2002) (stating that if the government

submits a §5k1.1 letter, the court can grant probation even in the most serious case) (Weinstein,

J.); <u>United States v. Stewart</u>, 590 F.3d. 93, 141 (2d Cir. 2009) ("And of course, use of a

defendant's cooperation to justify significant variances and departures from the otherwise

applicable Guidelines calculations is commonplace.").

   Mr. Oiring cooperated with the government immediately after his arrest on October 5,

2010, and respectfully submits that his cooperation warrants considerable leniency.  Mr. Oiring

provided substantial assistance to at least three government agencies.  Mr. Oiring did everything

asked of him:  he communicated online with coconspirators at the government's direction; he

recorded conversations with coconspirators; he convinced those he recorded to discuss the details

of their fraudulent schemes; and more.  Although he did not testify at a trial, Mr. Oiring prepared

with the government to testify at the Levy trial.  <u>See</u> §5k1.1Letter at 3 ("Oiring also was ready,

willing, and able, to testify at the trial of Donna and David Levy.  He participated in witness

preparation sessions, but ultimately, the Government elected not to call Oiring in view of the

12

strength of the other evidence presented at trial").  Due in no small part to Mr. Oiring's

cooperation, the government secured numerous guilty pleas and two guilty verdicts in this

matter.  As the §5k1.1 Letter itself explains:

> Oiring also provided useful information concerning the involvement
> of multiple co-defendants in the charged pump and dump stock
> fraud conspiracy.  Among the defendants whose involvement in the
> conspiracy Oiring helped establish were Susser, Bland, Oiring,
> Donna Levy, Prezioso, and Fernandez.  As the Court is aware, each
> of these defendants, other than Donna Levy, pleaded guilty prior to
> trial.  The Government credits Oiring's cooperation, and other
> defendants' awareness of his cooperation, with helping secure these
> defendants' guilty pleas.

Id.

The main aspect of Mr. Oiring's cooperation consisted of him providing useful and

timely information to the government.  Between November 2010 and May 2014, Mr. Oiring

participated in approximately ten multi-hour proffer sessions with officials from the USAO, the

Federal Bureau of Investigation ("FBI"), the Department of Homeland Security, and the SEC; in

addition, he cooperated with the DA's Office.  During these sessions, Mr. Oiring described the

inner-workings of approximately numerous, separate market manipulations, including some of

which the government had no knowledge.  He identified which stocks the coconspirators

targeted, and provided information about the individuals involved.  He discussed:

- How the coconspirators met each other and became involved in the fraudulent
  schemes;

- How the conspirators executed the various schemes;

- Details of the different strategies the group employed to artificially inflate the
  value of the stock, such as how they built charts and coordinated the stock sales,
  and;

- The identities of coconspirators previously unknown to the government.

One example of the completeness of Mr. Oiring's cooperation comes from a December 2010 proffer session.  Mr. Oiring alerted the government to a new scheme he learned co-conspirators were planning for January 2011.  Mr. Oiring identified the individual who informed Mr. Oiring about the scheme by both his given name and by the different screennames he used to perpetrate fraudulent marketing campaigns.  Mr. Oiring also identified several of the individual's business associates, linking them to the schemes as well, and gave the government the names of the targeted stocks.

Mr. Oiring also met with the SEC and the DA's Office a combined total of four times. Mr. Oiring provided substantially the same information to the DA's Office as he had to the USAO.  At the DA's direction, Mr. Oiring also proactively reached out to the target of the DA's investigation, Eric Van Nguyen.  The state prosecutors instructed Mr. Oiring to contact Van Nguyen and engage him in conversation and/or on-line communications.  The DA's Office sought to draw out Van Nguyen by having Mr. Oiring pose as a willing participant in future improper conduct.  Due to Mr. Oiring's efforts, state prosecutors ultimately indicted Van Nguyen for his participation in a conspiracy to defraud investors out of $200 million.  See §5k1.1Letter at 3 ("his active cooperation and information helped contribute to the prosecution by the Manhattan District Attorney's Office of Eric Van Nguyen, a notorious penny stock promoter who was indicted for his participation in a scheme involving over $200 million in investor losses.").

The September 2, 2016 revised Presentence Investigation Report ("PSR") notes that Mr. Oiring substantially assisted the successful prosecution of all of the defendants in this case, and also assisted the SEC and the DA's Office with their investigations.  See PSR at 22.  Mr. Oiring's efforts simultaneously cooperating with three government agencies counsels in favor of leniency.

14

2.      Mr. Oiring's Cooperation Helped Facilitate the Proper Administration of Justice

In a multi-defendant case, a defendant who enters an early guilty plea and cooperates, thereby inducing other defendants to plead guilty, assists not only the government, but also the court.  See United States v. Garcia, 926 F.2d 125 (2d Cir. 1991).  As the Second Circuit has recognized, where a defendant's conduct "'broke the logjam' in a multi-defendant case," his "activities facilitated the proper administration of justice in the District Courts."  Id. at 128.  In Garcia, the court held "additional assistance rendered the court in the disposition of charges against the other defendants justified the departure from the Guidelines."  Id.  Indeed, in United States v. Bobb, 1993 WL 8653, *2 (S.D.N.Y. 2003) the Court recognized that timely guilty pleas in what would otherwise have been a lengthy criminal prosecution may be a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" – in short, a separate and distinct basis for a downward departure.

Mr. Oiring's early plea and cooperation assisted in facilitating the proper administration of justice warrants consideration at sentencing.  In October 2010, Mr. Oiring met with the government for the first of many proffer sessions.  Shortly after, Mr. Oiring formally agreed to cooperate and pleaded guilty.  See §5k1.1 Letter at 2.  Indeed, Mr. Oiring cooperated before any other co-defendants in this case.  See PSR at 22.  This is precisely the point the Garcia and Bobb courts made.

Mr. Oiring's plea itself demonstrates his commitment to his cooperation.  This plea encompassed more information than the USAO knew about Mr. Oiring when he started cooperating.  In other words, Mr. Oiring pleaded guilty to conduct the USAO would not have known about, but for Mr. Oiring informing them himself.  The government acknowledged this

15

aspect of the cooperation to Probation.  The PSR noted that the government agreed that Mr.
Oiring provided "substantive, useful, and accurate information on his own conduct and the
conduct of all of his co-conspirators."  PSR at 22.

Mr. Oiring became the first co-defendant to enter a guilty plea.  Within two weeks, other
co-defendants started to plead guilty, and within six months, a total of seven co-defendants
pleaded guilty.  See §5k1.1 Letter at 4. ("Oiring's timely offer of assistance helped facilitate
cooperation from other defendants, and helped the Government obtain guilty pleas from all
charged noncooperating co-conspirators with whom he had worked.")  This includes:

- On July 13, 2011, Jeffrey Halbirt pleaded guilty to three counts in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud, and two substantive counts of securities fraud.

- On July 28, 2011, Michael Steinberg pleaded guilty to two counts in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud, and one substantive count of securities fraud.

- On August 10, 2011, Jeffrey Hurwitt entered a guilty plea to three counts in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud, and two substantive counts of securities fraud.

- On December 19, 2011, Stinson Bland, pleaded guilty to one count in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud.

- On December 19, 2011, William Mackey, pleaded guilty to one count in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud.

- On December 19, 2011, Bradley Susser entered a guilty plea to one count in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud; and

- On December 21, 2011, Ricardo Fernandez, pleaded guilty to one count in a seven-count Indictment, specifically: conspiracy to commit securities fraud and wire fraud.

The timeliness of Mr. Oiring's guilty plea and his cooperation with the government helped to facilitate the administration of justice by reasonably inducing his co-defendants to do the same.  See §5k1.1 Letter at 3; see also Garcia, 926 F.2d at 128 ("thereby 'conserv[ing] judicial resources by facilitating the disposition of a number of cases before trial.'") (internal citations omitted).  It is not a coincidence that in the wake of Mr. Oiring's plea, six other individuals pleaded guilty shortly thereafter as well.  Once Mr. Oiring began cooperating, the other defendants likely recognized that there was little chance of successfully contesting the charges at trial.  Indeed, in its §5k1.1 Letter, the government explicitly credits "[Mr.] Oiring's cooperation, and other defendants' awareness of his cooperation, with helping secure [co]defendants' guilty pleas."  §5k1.1 Letter at 3.  As a result of Mr. Oiring's timely cooperation and guilty plea, he helped conserve judicial and governmental resources, and, according to the government, also "helped facilitate cooperation from others defendants."  §5k1.1 Letter at 4. The guilty pleas that followed Mr. Oiring's substantially reduced the number of cases the government and the Court had to take to trial.  This militates in favor of a downward departure and/or a downward variance resulting in leniency for Mr. Oiring.

### 3.   Mr. Oiring's Post Offense Rehabilitation

The Court can also consider Mr. Oiring's volunteer efforts to work with the elderly as post-offense rehabilitation under the Guidelines.  "[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence."  United States v. Wong, 40 F.3d 1347, 1382 (2d Cir. 1994); see also United States v. Barton, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's efforts toward rehabilitation.").  Courts in the Second Circuit have granted substantial departures based on post-offense rehabilitation.  The court in United States v. Blake,

17

89 F. Supp. 2d 328 (E.D.N.Y. 2000), departed 21 levels, at least in part, "based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior." Id. at 339 (citing United States v. Core, 125 F.3d 74-75 (2d Cir. 1997), and United States v. Williams, 65 F.3d 301, 306 (2d Cir. 1995)).  After the defendant's arrest, she enrolled in college, obtained a full-time job, and regularly attended sessions with her therapist.  Similarly, here, after Mr. Oiring's arrest, he volunteered his time to the elderly in his community and obtained a full-time job caring for that same segment of society, a far cry from his former occupation.  Michael Oiring is a man worthy of the above discussed consideration.

Mr. Oiring immediately recognized the harm that his improper conduct had caused to the community, and thus he set out, equally as quickly, to make amends to the community at large. This started with his cooperation, but extended to his volunteer work and ultimately to his new career.  As previously noted, Mr. Oiring spent a great deal of time volunteering with Bikur Cholim.  He visited with, befriended, and comforted the elderly and those in emotional distress. He gave of himself in the best way he could to begin the process of repaying his debt to society. Volunteering with the elderly gave Michael a sense of purpose, and led directly to his new career, working for Genesis.  At Genesis, Mr. Oiring continues to spend time with the elderly and disabled, and provides them with a sense of companionship.

Although it is said that actions speak louder than words, words do count.  As such, it is noteworthy that Michael has confided in his friends and family about how much he regrets his improper conduct.  See Lederfeind Letter, Ex. A at 18 ("[Michael] is a remorseful, good-natured person…"); see also Pnina Letter, Ex. A at 7 ("Michael deeply regrets his actions.  He understands what he did was wrong, and that his actions negatively impacted others, including

his family.  Michael is a different person now, and has repeatedly told me that if he could go

back he would never commit these offenses.").

Each of these factors alone demonstrates the significant progress Mr. Oiring has made

towards complete rehabilitation since the commission of the offense.  When taken together, they

demonstrate Mr. Oiring's significant pre-sentence rehabilitation, and indicate that this change is

permanent.  See Blake, 89 F. Supp 2d at 339.  As a result, Mr. Oiring respectfully requests that

the Court take into consideration his post-offense charitable works for the community and his

efforts to demonstrate his rehabilitation.

### B.  Additional Factors Under Section 3553(a)

The Guidelines are not the only consideration for sentencing.  Section 3553(a) requires

courts to contemplate additional factors, even those disfavored under the advisory Guidelines.

The factors are as follows:  (1) the nature and circumstances of the offense and the history and

characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the

seriousness of the offense, to promote respect for the law, and to provide punishment for the

offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from

further crimes of the defendant; (3) the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct; and (4) the need

to provide restitution.  See 18 U.S.C. §3553(a); Cavera, 550 F.3d at 189; see also United States

v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  The Court can use any individual factor to justify a

downward variance that results in leniency for a defendant.  In contemplating the §3553(a)

factors, the Court must arrive at a sentence that is "sufficient, but not greater than necessary, to

comply with the purposes" of sentencing. 18 U.S.C. §3553(a); see also Gall v. United States, 552

U.S. 38, 49-50 (2007).  Neither the nature nor circumstances of the offense nor the history and

characteristics of the defendant need be extraordinary to justify a deviation from the advisory

Guidelines range.  See id. at 594-95 ("We reject . . . an appellate rule that requires

'extraordinary' circumstances to justify a sentence outside the Guidelines range."); see also

United States v. Jones, 531 F.3d 163, 171 (2d Cir. 2008) ("In reviewing a district court's

explanation of a sentence for reasonableness at either the procedural or substantive step of

analysis, Gall holds that an appellate court may not demand 'extraordinary' circumstances to

justify non-Guidelines sentences.").  Indeed, downward variances may be based on factors that

are "disfavored" under the Guidelines, even in the absence of extraordinary circumstances.  See

United States v. Munoz-Nava, 524 F.3d 1137, 1148 (10th Cir. 2008).

An analysis of the §3553(a) factors demonstrates that Mr. Oiring's situation is one that

militates in favor of leniency.  In particular, Mr. Oiring's history and characteristics (including

his cooperation and his assistance to the elderly in his community which the Court should

consider under the Guidelines as well as under §3553(a)(1)) and the need to avoid unwarranted

sentencing disparities.

### 1.  Mr. Oiring's History and Characteristics

Without minimizing the significance of the offenses to which Michael Oiring pleaded

guilty, Mr. Oiring has demonstrated the conduct and attributes that warrant leniency.  As

discussed in detail above, Mr. Oiring immediately acknowledged his error in judgment, has

learned from his wrongdoing, and continues to strive to make amends by positively contributing

to the community.  According to Michael's good friend Moshe Lederfeind, "[a]lthough Michael

has done wrong, he has on more than one occasion expressed regret over what he has done."

Lederfeind Letter, Ex. A at 17.  Indeed, the sentencing letters submitted in support of Mr. Oiring

discuss the regret and remorse he feels because of his actions underlying the commission of the offense.  See generally Ex. A.

Beyond the obvious benefit that a defendant generally provides to society through his cooperation, a defendant's cooperation also reveals much about his character.  Courts have recognized that cooperation can demonstrate everything from acceptance of responsibility, to a desire to make amends, to efforts at rehabilitation, and more.  In United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006), the Second Circuit held that consideration of the factors set forth in §3553(a) "includes the history of the defendant's cooperation and characteristics evidenced by cooperation, *such as remorse or rehabilitation*."  Id. at 33 (emphasis added).  Subsequently, in United States v. Stewart, the Circuit affirmed a district court's conclusion that the defendant's cooperation "demonstrates a willingness to help law enforcement and reduces the need for rehabilitation and deterrence."  Id. at 141.  If cooperation is truly a comment on one's character, as the Second Circuit seems to suggest, Mr. Oiring's significant, early, and extensive cooperation should speak loudly of his character and warrants consideration beyond the §5k1.1 letter.

Michael's character is also illustrated by his dedication to his community.  The letters sent by family and friends describe an individual who has expended serious time and effort to assist those in need.  Michael's friend Moshe Lederfeind recalls a time when Michael visited with Mr. Lederfeind's elderly neighbor, who has since passed away.  Mr. Lederfeind's neighbor "always look[ed] forward to Michael's visits" and certainly would have written "a glowing letter in support of Michael were he still here with us.  Stareshefsky Letter, Ex. A at 14.  Furthermore, Rabbi Sussman knows some of the seniors Michael spends time with, and describes how Michael is always trying to comfort and lift up their spirits, and how he "act[s] as a listening ear and tr[ies] to do whatever he could to alleviate some of their pain."  Sussman Letter, Ex. A at 3.

These letters demonstrate the hard work and dedication Michael puts into his work and volunteer efforts.

Kindnesses to others and assistance to the community are relevant to sentencing. Courts are permitted to impose more lenient sentences in cases where the defendant demonstrates dedication to his community and/or charitable service, than in cases where no such mitigating factors exist. See United States v. Shuster, 331 F.3d 294, 296 (2d Cir. 2003); United States v. Serafini, 233 F.3d 758, 772 (3d Cir. 2000); United States v. Crouse, 145 F.3d 786, 791 (6th Cir. 1998). Indeed, the kinds of selfless acts described above and below are precisely the kinds of things courts should take into account in fashioning appropriate sentences. One court has held that "[t]he focus should be on the defendant's activities, understood in the light of his career and resources, particularly those that go beyond the kind of 'impersonal writing of checks' that characterized many wealthy individuals." United States v. Mehta, No. Crim.01-10180-NG, 2004 WL 418119 at *6, (D.Mass. March 3, 2004). The court in Mehta noted that kind works for those in need are as important to understanding the character of a defendant as any other factor the court considers. Mehta is not the only court to so recognize. The Third Circuit also recognizes that leniency may be warranted where defendants assist those in their communities. Specifically, the Serafini court held that a defendant who made efforts to establish a fund to defray the cost of a bone marrow transplant for an individual, arranged for transportation to the hospital for a different individual, assisted a third individual to pay his electric bill so service would not be discontinued, and more, warranted leniency at sentencing. Serafini, 233 F.3d at 774-75.

As far back as college and continuing to date, Mr. Oiring has demonstrated his penchant for assisting those in need. His tutoring of struggling high school students while in college shows young Michael's desire to help others. The enormous amount of time he spent with the

22

young man suffering from a problematic home life, demonstrates that Mr. Oiring's caring extended beyond the academic to the real world problems of those he could assist.  Finally, the last four years of volunteer service at Bikur Cholim and work at Genesis, spending time with an oft ignored segment of society, the elderly, demonstrates that Michael still embraces the desire and ability to impact the lives of those in his community in a positive way.  "[Michael] tries to do things to pay back society and be a better person.  He visits the elderly and takes around the disabled as a volunteer, whether it be shopping or other recreational activities."  Lederfeind Letter, Ex. A at 17.  Michael puts others' needs first, and has even canceled plans with friends "because he was busy assisting the elderly individuals he works with."  Stareshefsky Letter, Ex. A at 14.  This speaks to his dedication to his rehabilitation.

Mr. Oiring, never a wealthy man, gave what he had to give … himself.  When he struggled for years to find employment after his arrest, Mr. Oiring volunteered his time and energy visiting with the elderly and disabled.  For this he deserves consideration as part of sentencing.

a.   *Any Term of Incarceration Would Cause a Hardship to the Oiring Family*

Michael is integral to the Oiring family.  He lives at home with his elderly parents.  When he is not at work, Michael is responsible for much of the household chores, such as driving his father to and from the doctor, and helping to keep the house in order.  See Pnina Letter, Ex. A at 7.  If Michael is sentenced to a term of imprisonment, it will cause hardship for his family.  In the very near future, Mr. Oiring's father will need to undergo a ███████████████████ and his family is counting on him to be there to help.  See id. ("In the coming months, Eli will need to undergo a ████████████████ ███████████.  I have no doubt Michael will step up to the plate and continue to help his father as he has done in the past.").  Eli's

upcoming surgery will leave him bedridden for several months.  Without Michael around to take

on the additional responsibilities, Mrs. Oiring will be left to take care of the home by herself, as

Michael is the only one who really contributes to the daily upkeep of the home.

Furthermore, Michael is an integral part of the lives of so many, especially his nieces and

nephews.  As discussed above, Michael's older sister Charlyne is married now with a family of

her own.  The couple has three children between the ages of six and 14 years old.  Charlyne often

feels as if she is raising three children on her own because her husband works long hours, and

often on the weekends.  See Travis Letter, Ex. A at 15.  Charlyne is grateful that she can rely on

Michael whenever she needs help.  Michael, for his part, loves spending time with his nieces and

nephew, and they adore him.  Michael visits Charlyne's house whenever he can, and frequently

takes care of the children so that Charlyne can have some time for herself.  It is always a treat for

the children to spend time with Michael.  "Michael plays games with them, and reads their

favorite stories to them.  Sometimes he takes them golfing, and out for pizza." Id.  Michael also

helps ████ and ████ with their homework, which is a very big help to Charlyne.  See id.

Charlyne describes Michael as an "excellent uncle" who the kids look forward to seeing when he

comes to the house.  Id.  If Michael were to be sentenced to a term of imprisonment, it would

harm not only Michael, but the other members of his family who have come to depend on his

availability to them.

    2.   <u>The Need to Provide Adequate Deterrence and Protect the Public from Future Crimes of the Defendant</u>

The chances are less than remote that Mr. Oiring will ever commit a crime again.  The

many letters submitted on Mr. Oiring's behalf demonstrate that his improper conduct in this case

directly contradicts how he has lived his life, both before and after the commission of the

offense.  See Pnina Letter, Ex. A at 7 ("Michael's conduct in this case is so completely out of

24

character for him…").  Furthermore, this case is the first and only instance where Mr. Oiring has committed a crime and, in the years since his arrest, has shown no signs of being a risk for future criminal activity.  Indeed, Mr. Oiring no longer works as a stock promoter and has no plans to return to the finance industry in any capacity.  Mr. Oiring's sentence should reflect the fact that deterrence has been achieved, and a term of imprisonment is not necessary to protect the public from him engaging in potential criminal conduct.

### C.  The Need to Avoid Unwarranted Sentencing Disparities

In determining the appropriate sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §3553(a)(6) (emphasis added).  Sentencing Mr. Oiring to a term of imprisonment at or near the recommended Guidelines range will create significant disparities between him and other similarly situated white collar defendants, including his co-defendants.  Although §3553(a)(6) primarily aims to avoid unwarranted sentencing disparities among defendants on a national level, it is not uncommon for courts in this Circuit to look to the sentences imposed on similarly situated codefendants in a multi-defendant case, as well.  See, e.g., Simon v United States, 361 F. Supp. 2d 35, 49 (E.D.N.Y. 2005) (noting that to avoid unwarranted sentencing disparities under §3553(a)(6), the court considered the sentence imposed on the codefendant as one factor in imposing a non-Guidelines sentence on the defendant.)

As the Court is aware, Mr. Oiring is the only defendant awaiting sentencing in this case. His co-defendants received sentences ranging from time served and no supervised release, to a 108-month term of imprisonment.  In determining the appropriate sentence, this Court considered a variety of factors, including the defendants' culpability and whether they

cooperated, pleaded guilty, or were convicted at trial.  Here, Mr. Oiring did not have a leadership role within the conspiracy, and cooperated with authorities immediately after his arrest.  His offense conduct closely mirrors that of fellow cooperator Jeffrey Halbirt, and, to a somewhat lesser extent, Messrs. Michael Steinberg and Jeffrey Hurwitt, who all received sentences of time served.

      1.  <u>Mr. Oiring is Comparable to Messrs. Halbirt, Steinberg, and Hurwitt</u>

Mr. Oiring respectfully submits that the non-incarceratory sentences given to Messrs. Halbirt, Steinberg, and Hurwitt are most instructive to formulating an appropriate sentence here. Their sentences are as follows:

- On July 13, 2011 Jeffrey Halbirt pleaded guilty to one count of conspiracy to commit securities fraud and wire fraud, and two substantive counts of securities fraud.  On April 13, 2015, this Court sentenced Mr. Halbirt to time served (one day) and one year of supervised release.  <u>See</u> <u>United States v. Halbirt</u>, 11 Cr. 62-03 (PAC).  Mr. Halbirt cooperated with the government.

- On July 28, 2011, Michael Steinberg pleaded guilty to one count of conspiracy to commit securities fraud and wire fraud, and one substantive count of securities fraud.  <u>See</u> <u>United States v. Steinberg</u>, 11 Cr. 62-02 (PAC).  Mr. Steinberg did *not* cooperate with the government and received a sentence of time served.

- On August 10, 2011 Mr. Hurwitt pleaded guilty to one count of conspiracy to commit securities fraud and wire fraud, and two substantive counts of securities fraud.  <u>See</u> <u>United States v. Hurwitt</u>, 11 Cr. 62-05 (PAC).  Mr. Hurwitt did *not* cooperate with the government and received a sentence of time served.

While there are notable differences between Mr. Oiring's and Mr. Halbirt's conduct and personal characteristics, Mr. Oiring respectfully submits that these differences weigh in favor of greater leniency in Mr. Oiring's case.  Mr. Halbirt pleaded guilty after Mr. Oiring.  Mr. Halbirt also cooperated with authorities, however, not until after Mr. Oiring and not until after the government indicted him.  In contrast, Mr. Oiring agreed to cooperate immediately after his *arrest*.  Like Mr. Oiring, Mr. Halbirt did not participate in some of the more egregious conduct in

the conspiracy.  For his role in the conspiracy, Mr. Halbirt agreed with others to promote and manipulate targeted stocks in an effort to artificially inflate the stock price.  Moreover, Mr. Oiring and Mr. Halbirt both have no prior criminal records, placing them within criminal history category I under the Guidelines.  At sentencing, this Court granted Mr. Halbirt a downward departure based, at least in part, on these facts.

Messrs. Steinberg and Hurwitt also engaged in offense conduct similar to Mr. Oiring, making their circumstances a reasonable comparison.  Mr. Steinberg participated in a coordinated effort to artificially inflate the price of numerous targeted stocks.  He hired stock promoters and online marketers to assist in the manipulation schemes, personally solicited investors through mass email campaigns, and more.  He did not cooperate with authorities but received a sentence of time served.

Likewise, Mr. Hurwitt posted positive reviews on the internet in order to artificially inflate the price of a targeted stock, often using Twitter, a micro-blogging social media website. Furthermore, according to the criminal complaint, Mr. Hurwitt attempted to conceal his identity and the identities of his coconspirators by suggesting the group use "drop phones" when discussing matters over the telephone.  Criminal Complaint ¶ 28, n.9, United States v. Susser, et al., 10 Mag. 2190 (S.D.N.Y. 2010).  Mr. Hurwitt pleaded guilty but did not cooperate with the government.  Nevertheless, this Court sentenced him to time served.

Like Messrs. Hurwitt and Steinberg, Mr. Oiring posted statements online and assisted in coordinated efforts to artificially increase the price of targeted stocks.  But despite these similarities, the differences in conduct between Mr. Oiring, and Messrs. Halbirt and Steinberg are significant.  Mr. Steinberg solicited millions of investors, targeting them directly by email, whereas Mr. Oiring posted information on websites and other online forums to the public at-

27

large.  Furthermore, Mr. Oiring made no attempt to conceal his improper conduct by purchasing

"drop phones" as Mr. Hurwitt suggested.  Indeed, Mr. Oiring owned up to his wrongdoing right

after his arrest and became a cooperating witness.  Mr. Oiring respectfully asks this Court to

consider these important differences when deciding an appropriate sentence.

      2.  <u>Mr. Oiring Is Not Comparable to the Defendants Who Received Custodial
Sentences</u>

The defendants in this case who received custodial sentences did not cooperate with the

government, and operated at high levels within the conspiracy.  Mr. Bland coordinated touting

efforts, and advised insiders and promoters on the timing of the touts.  Mr. Mackey, a

sophisticated financial professional, coordinated all aspects of manipulation for the campaigns.

Donna and David Levy played significant roles within the conspiracy.  David Levy acted as a

"leader within the conspiracy" who "orchestrated the merger of several start-up companies that

he controlled," while Donna Levy, acted as "a manager within the conspiracy" and facilitated

contact between the co-defendants.  PSR ¶ 31.  This Court sentenced them as follows:

- On December 19, 2011 Stinson Bland pleaded guilty to conspiracy to commit securities fraud and wire fraud.  On April 17, 2012, this Court sentenced Mr. Bland to 13 months' imprisonment to be followed by three years of supervised release.  <u>See</u> <u>United States v. Bland</u>, et al 11 Cr. 62-03 (PAC).

- On December 19, 2011, William Mackey pleaded guilty to conspiracy to commit securities fraud and wire fraud.  On April 17, 2012, this Court sentenced Mr. Mackey to 18 months' imprisonment to be followed by three years of supervised release.  <u>See</u> <u>United States v. Mackey</u>, 11 Cr. 62-07 (PAC).

- On March 21, 2013, a jury convicted Donna Levy of four counts of securities fraud, including conspiracy to commit securities fraud and wire fraud.  On April 19, 2014, this Court sentenced Ms. Levy to 66 months' imprisonment to be followed by three years of supervised release.  <u>See</u> <u>United States v. Levy</u>, 11 Cr. 62-04 (PAC).

- On March 21, 2013, a jury convicted David Levy of six counts of securities fraud, including conspiracy to commit securities fraud and wire fraud.  On January 24, 2014, this Court sentenced Mr. Levy to 108 months' imprisonment to be followed by three years of supervised release.  <u>See</u> <u>United States v. Levy</u>, 11 Cr. 62-11 (PAC).

Mr. Oiring is not similarly situated with these defendants and should be treated differently.  First, Mr. Oiring's improper conduct largely consisted of posting statements online, and acting as the middle-man between the leaders of the scheme and the online promoters referred by him.  Mr. Oiring did not act in a leadership capacity within the conspiracy.  Second, Mr. Oiring cooperated with the government subsequent to arrest, and Mr. Oiring did so first.  For over four years, Mr. Oiring provided substantial assistance to at least three government agencies. Indeed, the government credits Mr. Oiring's substantial assistance for the successful prosecution of all of the defendants in this case, as well as the indictment of an individual by the DA's Office for defrauding investors out of $200 million.  See §5k1.1 Letter at 3.  In contrast, the above discussed defendants were leaders, engaged in more egregious conduct and, in certain cases, lost a jury trial.  While Mr. Oiring participated in the same conspiracy with these defendants, his conduct, both pre and post arrest, sets him far apart from those this Court deemed worthy of incarceratory sentences.

## CONCLUSION

For the foregoing reasons, we ask this Court to depart from the Guidelines and accept the PSR's recommendation and impose a non-incarceratory sentence for Mr. Oiring.

Dated:      New York, New York
            September 15, 2016

                                    MORVILLO LLP


                                    BY: _____
                                        Gregory R. Morvillo (GM-1234)

                                    *Attorneys for Defendant Michael Oiring*
                                    500 Fifth Ave., 43rd Floor
                                    New York, New York 10110
                                    (212) 796-6330